35 F.3d 1208
 UNITED STATES of America, Plaintiff-Appellee,
v.
Ralph MOUNTS, Jamal Hamdan, Isabel Cristina Restrepo, a/k/a
Isabel C. Scott, Thelma Zulima Buitrago, a/k/a
Beatriz E. Agudelo, and Maurice Elliott,
Defendants-Appellants.
 Nos. 93-1823, 93-1839, 93-1860, 93-1861 and 94-1506.
 United States Court of Appeals,
Seventh Circuit.
 Argued June 8, 1994.
Decided Sept. 27, 1994.
Rehearing Denied in No. 93-1839
Nov. 21, 1994.
Rehearing Denied in No. 93-1861
Nov. 28, 1994.
 
 Barry R. Elden, Asst. U.S. Atty., Christopher Cook (argued), Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, IL, for U.S.
 Elliot M. Samuels, Chicago, IL (argued), for Ralph G. Mounts.
 Kevin E. Milner, Chicago, IL (argued), for Jamal Hamdan.
 Elliott T. Price, Chicago, IL (argued), for Isabel C. Restrepo.
 Terry G. Collins, Houston, TX (argued), for Thelma Z. Buitrago.
 James D. Montgomery, Thomas C. Maeszewski (argued), Sheldon R. Sobol, Montgomery & Associates, Chicago, IL, for Maurice Elliott.
 Before CUDAHY, ESCHBACH, and FLAUM, Circuit Judges.
 ESCHBACH, Circuit Judge.
 
 
 1
 This is the consolidated appeal of five criminal defendants convicted of conspiracy to possess with intent to distribute cocaine. 21 U.S.C. Secs. 841(a)(1), 846. The defendants challenge both their convictions and sentences. We affirm.I.
 
 
 2
 Each of the defendants involved in this appeal participated in a loosely-structured narcotics organization which funneled Columbian cocaine through Houston, Texas for distribution and resale in Chicago, Illinois. The head of the organization, David Hamdan ("David"), had been supplying cocaine to distributors in the Chicago area on a regular basis since 1985. In late 1989, David's primary supplier, a man named "Javier", returned to Columbia to avoid apprehension by United States law enforcement. In his stead, Javier directed his daughter, Isabel Cristina Restrepo, to take over his business. Restrepo and David met, became romantically involved, and began living together. In the fall of 1990, Restrepo introduced David to a friend in Houston, Thelma Zulima Buitrago. After meeting Buitrago, David's ability to acquire and distribute cocaine changed dramatically.
 
 
 3
 During 1991, Buitrago worked with various Houston suppliers to arrange several multiple kilogram cocaine sales to David. To move the cocaine from Houston to Chicago, David employed his younger brother, Jamal Hamdan ("Jamal"), an old friend, Ralph Mounts, Mahmoud Ayyash ("Mahmoud"), and Rosella De La Cruz. Once in Chicago, David sold the cocaine to wholesale supplier Hamdi Ayyash ("Hamdi") who in turn distributed smaller quantities to Maurice Elliott, Joseph Horton, and Jim Clay for retail sale.
 
 
 4
 The organization began to unravel in August 1991 when Arkansas state troopers arrested Mounts for a traffic violation and seized 60 kilograms of cocaine from his rental car. Despite this setback, in August and September, David received at least two more large shipments of cocaine from Houston through his efforts and the efforts of Mahmoud, Jamal, and De La Cruz. Nonetheless, the organization's fate was soon sealed. On September 9, 1991, DEA agents arrested Hamdi and Mahmoud after Hamdi attempted to purchase 30 kilograms of cocaine from an undercover agent. Within a month, Hamdi and Mahmoud began cooperating with authorities and implicated all the defendants joined in this appeal.
 
 
 5
 On February 13, 1992, a grand jury indicted Cristina Restrepo, Jamal Hamdan, and Maurice Elliott, as well as Joseph Horton, David Hamdan, Hamdi Ayyash, Mahmoud Ayyash, Rosella De La Cruz, and Jim Clay on various narcotics offenses. Two months later, the same grand jury handed down a superseding indictment adding defendants Thelma Buitrago, Abdallah Zaatrah, and Ralph Mounts. Count One of the superseding indictment charged all twelve defendants with conspiring to possess with intent to distribute multiple kilogram quantities of cocaine in violation of 21 U.S.C. Secs. 841(a)(1), 846 and 18 U.S.C. Sec. 2. Count One described a conspiracy spanning from April 10, 1991 through December 13, 1991. Count Two charged all defendants except Mounts with possession of 50 kilograms of cocaine with intent to distribute on or about September 9, 1991, in violation of 21 U.S.C. Sec. 841(a)(1) and 18 U.S.C. Sec. 2. Counts Three through Eleven charged Zaatrah, Mounts, and David with travelling in interstate commerce to promote the unlawful activity of possessing and distributing cocaine, in violation of the Travel Act, 18 U.S.C. Sec. 1952(a)(3).
 
 
 6
 The five defendants in this case pleaded not guilty. Prior to trial, the district court severed Elliott's trial from the others'. After a month-long trial, a jury convicted Restrepo, Jamal, Mounts, and Buitrago on all counts. A different jury convicted Elliott on all counts as well. After conducting individual sentencing hearings, the district court sentenced the defendants as follows: Restrepo, 121 months' imprisonment; Jamal, 188 months' imprisonment; Mounts, 188 months' imprisonment; Buitrago, 292 months' imprisonment; and Elliott, 240 months' imprisonment. Additionally, the district court ordered five years of supervised release for each defendant. After sentencing, all five defendants filed timely appeals. We have jurisdiction to review their challenges under 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742(a).
 
 II. Analysis
 
 7
 The defendants raise a variety of issues. We first address their evidentiary challenges and then discuss their sentencing arguments. Finally, we address Elliott's challenge to the jury instructions given at his trial.
 
 
 8
 A. Denial of Ralph Mounts' Motion to Suppress
 
 
 9
 Prior to trial, Mounts moved to suppress evidence obtained after his arrest in Arkansas. After conducting an evidentiary hearing, the district court denied his motion, concluding that the stops of Mounts by Arkansas state troopers had been legal. Mounts now challenges this ruling.
 
 
 10
 This court reviews the district court's denial of a motion to suppress for clear error. United States v. Tipton, 3 F.3d 1119, 1121 (7th Cir.1993). Clear error exists only if after reviewing all of the evidence, we are left with "the firm conviction that a mistake has been made." Id. In conducting our review, we give particular deference to the district court which had the opportunity to hear the testimony and observe the demeanor of the witnesses. Id. (quoting United States v. Withers, 972 F.2d 837, 841 (7th Cir.1992)).
 
 
 11
 When a defendant challenges the lawfulness of an allegedly pretextual traffic stop, the district court must conduct an objective, two-prong analysis, determining first whether law enforcement authorities had reasonable suspicion to make the stop, and second, whether state or municipal law authorized the officers to effect the stop in question. United States v. Fiala, 929 F.2d 285, 287 (7th Cir.1991) (citing United States v. Trigg, 878 F.2d 1037, 1041 (7th Cir.1989)).
 
 
 12
 On August 7, 1991, Arkansas State Trooper Ronald Ball[1] was patrolling Interstate 30 south of Little Rock, Arkansas when he approached a rental car bearing a 1991 Georgia license plate. He noticed that the license plate did not display a sticker indicating the month it expired, so he radioed an inquiry on the license plate. When the dispatcher informed him that the Georgia computers had no records on the license plate, Officer Ball decided to pull the car over to check its registration.
 
 
 13
 After pulling the car over, Officer Ball asked the driver, Ralph Mounts, for his driver's license and registration papers. Mounts produced a Texas license and the car's rental agreement. After Officer Ball satisfied himself that Mounts was in lawful possession of the car, he issued Mounts a citation for not displaying a monthly sticker on his license plate. He then asked Mounts for permission to search the car. Mounts consented. When the troopers removed a heavy suitcase from the trunk, Mounts asked that the search stop. Although the troopers suspected the suitcase contained contraband, the troopers complied and permitted Mounts to leave.
 
 
 14
 Approximately 40 minutes later, another trooper, Officer Karl Byrd, stopped Mounts again. During the time between the two stops, the troopers had received additional information indicating that Mounts had a revoked driver's license from Illinois. After confirming that Texas law did not allow an individual to obtain a driver's license after another state revokes his license, Officer Byrd arrested Mounts for driving in Arkansas on an invalid license. The troopers impounded Mounts' car and conducted an inventory search of the vehicle. They found 60 kilograms of cocaine in a suitcase located in the trunk.[2]
 
 
 15
 After hearing Officer Ball's testimony and reviewing the state suppression hearing transcript, the district court denied Mounts' motion to suppress. With regard to the first stop, the district court rejected Officer Ball's reliance on the absence of a monthly sticker on Mounts' license plate as grounds for reasonable suspicion, finding that a trooper with his level of experience should reasonably know that Georgia law does not require its license plates to bear a monthly sticker. However, the district court found that Officer Ball also relied on the absence of any car registration information in the Georgia computer system in deciding to pull Mounts over. The court concluded that the absence of any registration information created a reasonable suspicion sufficient to permit Officer Ball to stop Mounts. The court also held that the second stop of Mounts and the subsequent inventory search were constitutionally valid.
 
 
 16
 On appeal, Mounts challenges only the validity of the first stop by the Arkansas State Troopers.[3] He first argues that the district court clearly erred when it concluded that Officer Ball relied on the absence of registration information in deciding to stop him. According to Mounts, Officer Ball offered the "absence of registration information" rationale only after the district court made clear that the lack of a monthly sticker did not give him reasonable suspicion to justify the initial stop. Mounts faults the district court for accepting Officer Ball's "fabricated", after-the-fact justification for the investigatory stop.
 
 
 17
 After reviewing the transcript of Officer Ball's testimony, we agree that there could be some question as to the veracity of Officer Ball's testimony. However, we also recognize that the district court had the benefit of personally observing Officer Ball testify. The district court accepted his explanation for stopping Mounts only after listening to his testimony, observing his demeanor, questioning him personally, and reviewing the corroborating report he made immediately after Mounts' stops. In light of the particular deference this Court gives to district courts on questions of credibility, see Tipton, 3 F.3d at 1121, we are unable to conclude that the district court clearly erred in accepting Officer Ball's explanation.
 
 
 18
 Mounts' next argument is more substantial. He contends that even if Officer Ball's testimony is accepted as true, the facts in the officer's possession on August 7, 1991, did not support a reasonable suspicion to stop his car. "Police officers are justified in conducting a brief investigative Terry stop if [the] officer is 'able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.' " Tipton, 3 F.3d at 1122 (quoting Terry v. Ohio, 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968)). In this case, the issue is whether Officer Ball could rationally infer from the absence of any car registration information in the Georgia records that Mounts was violating Arkansas law. See Fiala, 929 F.2d at 287.
 
 
 19
 Arkansas law requires that all out-of-state vehicles driven in Arkansas be properly registered in their home states. See Ark.Code Ann. Sec. 27-14-704 (Michie 1987). Mounts emphasizes that the absence of any registration information for a particular vehicle could have an innocent explanation, such as a lag time between license plate registration and the corresponding update of state records. Because there are valid reasons why a state's computer might not have information on every legally registered vehicle, and in particular a late-model rental car such as his, Mounts argues that Officer Ball could not rationally infer that the absence of registration information indicated criminal activity. See People v. Roundtree, 240 Ill.App.3d 963, 181 Ill.Dec. 531, 533, 608 N.E.2d 604, 606 (1993) (upholding suppression of evidence as not against the manifest weight of evidence after police stop car on dispatch information of no vehicle registration).
 
 
 20
 While Mounts emphasizes the innocent explanations, the government underscores the various unlawful reasons, such as counterfeit plates or failing to register a vehicle, for why a computer system would have no vehicle registration records. Although close, we cannot conclude that Mounts presented sufficient evidence to support a determination that Officer Ball's stop was unreasonable.[4] Therefore, we affirm the district court's denial of Mounts' motion to suppress.
 
 
 21
 B. Admission of Evidence of Prior Drug Dealing by Restrepo and Buitrago
 
 
 22
 At trial, the district court allowed the government to present evidence that two of the defendants, Restrepo and Buitrago, had engaged in drug transactions prior to the beginning of the conspiracy described in the indictment. The government offered the evidence to establish the knowledge and intent of Restrepo and Buitrago during the charged conspiracy pursuant to Federal Rules of Evidence 403 and 404(b).
 
 
 23
 On appeal, Restrepo and Buitrago argue that the district court abused its discretion in admitting this evidence. Jamal, Mounts, and Buitrago also argue that the admission of the evidence against Restrepo denied them a fair trial. Finally, Mounts contends that the admission of the evidence improperly amended the grand jury indictment in violation of the Fifth Amendment. We address each argument in turn.
 
 
 24
 1. Admission of Evidence against Restrepo and Buitrago
 
 
 25
 Federal Rule of Evidence 404(b) states that:
 
 
 26
 Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.
 
 
 27
 Fed.R.Evid. 404(b). The test for admitting past act evidence under Rule 404(b) is whether:
 
 
 28
 (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue, (3) the evidence is sufficient to support a jury finding that the defendant committed the similar act, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.
 
 
 29
 United States v. Shields, 999 F.2d 1090, 1099 (7th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 877, 127 L.Ed.2d 74 (1994), (citing United States v. Zapata, 871 F.2d 616, 620 (7th Cir.1989)). This Court will disturb the district court's Rule 404(b) ruling only if we find "an error which rises to the very serious and uncommon level of an abuse of discretion." United States v. Hilgeford, 7 F.3d 1340, 1345 (7th Cir.1993). An abuse of discretion occurs only "when no reasonable person could take the view of the trial court." Id.
 
 
 30
 In regard to Restrepo, the government presented evidence of her unsuccessful efforts to purchase one kilogram of cocaine in May 1984. While Restrepo concedes that the evidence of the 1984 events was sufficient to support a finding that she engaged in those negotiations,[5] she argues that the prior acts evidence did not satisfy the other three prongs of Rule 404(b). We disagree.
 
 
 31
 Restrepo's contention that the evidence should not have been admitted because her intent and knowledge were not at issue flies directly in the face of her defense at trial. The prosecution presented a great deal of evidence demonstrating Restrepo's presence and participation in various aspects of the cocaine conspiracy. She counted money, carted drug couriers to and from the airport, and discussed the supply of cocaine with Hamdi. In response, Restrepo argued vigorously that she was only David's girlfriend and did not know that her actions were, in fact, assisting the conspiracy. During closing arguments, Restrepo again emphasized her lack of intent. Given her choice of defense, Restrepo's knowledge and intent were obviously critical matters to which the Rule 404(b) evidence was properly directed.
 
 
 32
 Restrepo next argues that her actions in 1984 were not sufficiently similar or close enough in time to the 1991 charged conspiracy to warrant admission under Rule 404(b). Restrepo points to the factual dissimilarities between the 1984 events and the charged conspiracy of 1991, emphasizing the small amount of cocaine involved in 1984 (one kilogram) and the fact that the unconsummated deal occurred seven years earlier. While these difference are significant, the district court did not plainly err in concluding that the transactions were sufficiently similar for purposes of Rule 404(b). Finally, we agree with the government that the probative value of the 1984 transaction was not substantially outweighed by possible prejudice to Restrepo. See Fed.R.Evid. 403. Proof that on a previous occasion Restrepo had been an active participant in the negotiation of a cocaine transaction was important to the jury's consideration of Restrepo's claim that she was just David's girlfriend. Moreover, the district court's careful and repeated limiting instructions as to the proper use of this evidence cured any possible prejudice to Restrepo.
 
 
 33
 The government also presented Rule 404(b) evidence in its case in chief to establish the intent and knowledge of Buitrago. A DEA agent testified that in July 1989, Buitrago and a male friend met with him on several occasions to discuss the sale of four kilograms of cocaine. Although Buitrago agreed to the sale, the deal eventually fell through because Buitrago's suppliers could not deliver. On appeal, Buitrago argues that the district court abused its discretion in admitting this evidence because the 1989 purchase negotiations were not sufficiently similar to the crimes charged. This argument is without merit. In 1989, Buitrago engaged in face-to-face negotiations with an undercover DEA agent to supply him with multiple kilograms of cocaine. In 1991, Buitrago conspired with David to supply him with multiple kilograms of cocaine. These transactions are sufficiently similar in scope and purpose that Buitrago's argument to the contrary borders on the ridiculous.
 
 
 34
 Buitrago also asserts that the Rule 404(b) evidence was not relevant to any fact at issue at the time the evidence was offered. This argument is unavailing because unlike the Second Circuit to which Buitrago cites, see United States v. Figueroa, 618 F.2d 934, 939 (2d Cir.1980) and United States v. Ramirez, 894 F.2d 565, 569-570 (2d Cir.1990), this Circuit permits the government to present Rule 404(b) evidence in its case in chief if the crime requires proof of specific intent. See United States v. Liefer, 778 F.2d 1236, 1243 (7th Cir.1985). Since conspiracy to possess with intent to distribute cocaine is a specific intent crime, Buitrago's relevancy argument fails.
 
 2. Denial of a Fair Trial
 
 35
 Buitrago and Mounts argue that the admission of evidence against Restrepo concerning her 1984 cocaine transaction denied them a fair trial. Hamdan adopts this argument as well. The defendants contend that they were unduly prejudiced by the "spillover effect" of this Rule 404(b) evidence. Although not clearly articulated, their argument appears to have two bases--that the evidence was inadmissible against Restrepo and that the jury improperly considered that evidence against defendants other than Restrepo.
 
 
 36
 The defendants' first argument fails because, as discussed above, the district court properly admitted the Rule 404(b) evidence against Restrepo. The defendants' second contention is also easily resolved. The defendants offer a variety of surmises, assumptions, and conjectures as to why they believe the jury considered Restrepo's Rule 404(b) evidence against them,[6] yet they fail to demonstrate why the district court's careful and repeated instructions to the jury as to the limited use of this evidence did not suffice to cure any potential prejudice to them. As this Court has repeatedly stated, juries are presumed to follow their instructions. United States v. Kreiser, 15 F.3d 635, 641 (7th Cir.1994). See also Zafiro v. United States, --- U.S. ----, ----, 113 S.Ct. 933, 939, 122 L.Ed.2d 317 (1993). With proper instructions, evidence of other crimes may be admitted against one defendant in a multiple defendant trial. United States v. Kane, 726 F.2d 344, 350 (7th Cir.1984). Since the defendants do not challenge the adequacy of the district court's limiting instructions or offer any proof that the jury disregarded those instructions, we reject their contention that the Rule 404(b) evidence against Restrepo somehow denied them a fair trial.
 
 3. Constructive Amendment of the Indictment
 
 37
 Finally, Mounts alone argues that the introduction of evidence concerning events prior to the time period charged in the indictment constructively amended the indictment in violation of the Fifth Amendment.[7] He asserts that the evidence presented to the jury concerning Restrepo's 1984 cocaine transaction, as well as evidence that David and Hamdi engaged in narcotics transactions prior to April 1991 constructively "amended the indictment by broadening the possible bases for conviction beyond the actual charges in the indictment."
 
 
 38
 The testimony and evidence about which Mounts complains wholly concerned other defendants. The government offered no evidence that Mounts engaged in any unlawful conduct not charged in the indictment. Therefore, Mounts argues that not only did the jury convict him for events preceding the charged 1991 conspiracy but that the jury did so in the complete absence of incriminating evidence. We reject this claim. Not only does this argument lack common sense, it ignores the district court's instructions to the jury. The court instructed the jury not to consider the evidence concerning Restrepo's 1984 actions against any other defendant, including Mounts. It also advised the jury that it should find Mounts guilty of conspiracy only if it found that the conspiracy charged in the indictment existed and that Mounts "knowingly and intentionally became a member of the conspiracy." Presuming the jury followed their instructions, Mounts was not convicted for any conspiracy other than the one charged in the indictment.
 
 
 39
 This Court considered a similar claim in United States v. Kreiser, 15 F.3d 635, 641 (7th Cir.1994). In that case, the defendant argued that government's Rule 404(b) evidence constructively amended his indictment. This Court held that where the district court properly instructs the jury as to the limited purpose of Rule 404(b) evidence and the defendant presents no evidence to rebut the strong presumption that the jury followed the instructions, there is no unconstitutional expansion of the indictment. Id. Since Mounts similarly provides no evidence to indicate that the jury disregarded its instructions, his challenge necessarily fails.
 
 
 40
 C. Disclosure of Jamal Hamdan's Houston Arrest
 
 
 41
 Prior to trial, the government provided Jamal with copies of his criminal record, pursuant to Federal Rule of Criminal Procedure 16(a)(1)(B).[8] These records disclosed only one alcohol-related conviction.[9] At trial, the government focused on Jamal's involvement in two trips to Houston to purchase cocaine to prove his involvement in the conspiracy. Its primary evidence of Jamal's involvement came from the testimony of Hamdi, Mahmoud, and De La Cruz. In his defense, Jamal argued that these cooperating witnesses were lying and that the government could not corroborate their assertions that Jamal took either of these trips to Houston. One of those trips in dispute occurred on October 22-23, 1991.
 
 
 42
 On August 19, 1992, eight days into the trial, the prosecutor informed Jamal that she had a government agent available to testify about Jamal's arrest in Houston on October 23, 1991. Specifically, the police had arrested Jamal and David and seized 40 kilograms of cocaine and $300,000 from them. Jamal objected to the government's intention to introduce this evidence, claiming the prosecutor violated her Rule 16 disclosure responsibilities and asked the district court to exclude the evidence. Alternatively, he moved for a mistrial.
 
 
 43
 The prosecutor argued that she did not violate Rule 16 because she had not learned of Jamal's arrest until an interview with De La Cruz on Sunday, August 16. However, she admitted that, although she did not recall, federal agents working on the case in fact reported to her that they had told her of Jamal's arrest pretrial. The district court examined the Houston arrest report in camera and invited Jamal to file a motion to suppress, indicating that it would be willing to conduct an evidentiary hearing on the lawfulness of Jamal's arrest. Jamal declined to file a motion to suppress because he had not seen the arrest record and felt unable to conduct an adequate suppression hearing. Instead, Jamal and the other defendants stipulated with the government that Jamal had been in Houston on October 23, 1991. In turn, the government did not mention his arrest or any of the facts surrounding it.
 
 
 44
 On appeal, Jamal contends that the government violated Fed.R.Crim.P. 16(a)(1)(B) by not earlier disclosing the government's knowledge of his Houston arrest. He claims this violation deprived him of an opportunity to move to suppress the evidence prior to trial and that the district court's handling of the government's discovery violation "forced" him to enter into the stipulation which "decimated his trial defense." In contrast, the government argues that Jamal waived these arguments when he knowingly and intentionally entered into the stipulation. Additionally, the government contends that it did not violate Rule 16's disclosure requirements and that the district court's actions cured any possible prejudice to Jamal.
 
 
 45
 " 'Waiver is the intentional relinquishment or abandonment of a known right.' " United States v. Olano, --- U.S. ----, ----, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) (citing Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938)). In this case, we agree with the government that Jamal waived his various challenges to the government's alleged Rule 16 violation by entering into the government-offered stipulation. When the dispute over Jamal's Houston arrest first erupted, the district court reasonably offered to entertain a motion to suppress the Houston arrest evidence mid-trial and received vigorous arguments on several occasions from both Jamal and the prosecutor, giving Jamal ample time to consider his options. Ultimately, Jamal declined to file a suppression motion. Instead, he made a knowing and calculated decision to enter into the government's stipulation. Having negotiated a deal certain to keep the jury from hearing the extremely damaging details of his arrest, we see no reason why Jamal should be allowed to renege on his bargain.
 
 
 46
 However, even if we concluded that Jamal did not waive his arguments concerning the Houston arrest evidence, Jamal's challenge would fail. A new trial would be warranted only if the government violated Rule 16 and that the remedy offered by the district court was inadequate to provide him with a fair trial. See, e.g., United States v. Caudill, 915 F.2d 294, 299 (7th Cir.1990). Having carefully reviewed the record, we conclude that even if the government violated its disclosure obligations under Rule 16(b)(1)(A),[10] the steps taken by the district court sufficiently remedied any possible prejudice to Jamal.[11] The district court's handling of this evidence was reasonable and well within its discretion under Fed.R.Crim.P. 16(d)(2).
 
 D. Sufficiency of the Evidence
 
 47
 Jamal Hamdan and Cristina Restrepo challenge the sufficiency of the evidence underlying their convictions. Specifically, they argue that the government's key witnesses, Hamdi, Mahmoud, and De La Cruz, were so unreliable and biased that no rational jury should have believed them or relied on their testimony. This challenge is meritless. We will not reweigh evidence or make credibility determinations when reviewing a defendant's challenge to the sufficiency of evidence underlying his or her conviction. United States v. Marin, 7 F.3d 679, 688 (7th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994). Since Jamal and Restrepo contest only the credibility of the government's witnesses, their argument fails.
 
 
 48
 E. Sentencing Challenges--Mounts, Jamal, and Buitrago
 
 
 49
 Mounts, Jamal, and Buitrago raise a variety of sentencing challenges. First, all three defendants argue that the district court overcalculated the amount of cocaine for which each one was responsible. Mounts and Jamal also argue that they are entitled to a reduction of their base offense level under U.S.S.G. Sec. 3B1.2 for being minor participants in the cocaine distribution conspiracy. Finally, Buitrago argues that the district court clearly erred in finding her trial testimony perjurious and thereby increasing her base offense level by two for obstruction of justice under U.S.S.G. Sec. 3C1.1. We review the district court's factual findings, including its drug quantity calculations, for clear error, and its legal conclusions de novo. United States v. Price, 988 F.2d 712, 720 (7th Cir.1993); 18 U.S.C. Sec. 3742(e).
 
 
 50
 The first two challenges are easily resolved. In this case, the district court was quite conservative in attributing cocaine quantities to the various defendants, holding each of the defendants responsible only for the minimum amount of cocaine for which he or she was actually responsible, either by transporting, selling, or purchasing it.[12] We have considered each of the defendants' challenges to the district court's amount calculations and find them all to be without merit. In no way were the district court's quantity calculations "clearly erroneous." No further discussion of this aspect of the defendants' sentences is necessary.
 
 
 51
 Similarly, we find no error in the district court's decision not to reduce Mounts' and Jamal's base offense level under U.S.S.G. Sec. 3B1.2. This section allows a sentencing court to reduce a defendant's base offense level if the court finds the defendant was either a minor or minimal participant in the criminal activity.[13] Mounts and Jamal argue that the district court clearly erred in denying them a Sec. 3B1.2 decrease because they played minor roles in the overall cocaine distribution conspiracy (both were couriers) and participated only for a short time. They emphasize that they were easily replaceable "mules" who took no part in the negotiating, purchasing, or selling of the cocaine.
 
 
 52
 In contrast to Mounts' and Jamal's self-deprecating modesty, the district court found their roles as couriers extremely important to the success of the conspiracy. The court emphasized that without reliable couriers to transport the cocaine over the long distance from Houston to Chicago, David's distribution enterprise would have folded. We find no error in the district court's analysis. Jamal and Mounts provided repeated and vital assistance to the conspiracy. See United States v. Osborne, 931 F.2d 1139, 1157-59 (7th Cir.1991) (holding that repeated provision of drug courier services precludes treatment as a "minor participant"). The district court reasonably concluded that their level of participation was inconsistent with a sentencing reduction for a defendant's "mitigating role." See U.S.S.G. Sec. 3B1.2.
 
 
 53
 Finally, Buitrago argues that the district court clearly erred by increasing her base offense level for obstruction of justice. Sentencing Guidelines Sec. 3C1.1 provides for a two-level increase "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." The Commentary lists "committing, suborning, or attempting to suborn perjury" and "providing materially false information to a judge or magistrate" as examples of the type of conduct to which Sec. 3C1.1 applies. U.S.S.G. Sec. 3C1.1, comment., n. 3.
 
 
 54
 Both the Supreme Court and this Circuit have held that a finding of perjury by a testifying defendant will support an obstruction of justice sentencing enhancement under Sec. 3C1.1. United States v. Dunnigan, --- U.S. ----, ----, 113 S.Ct. 1111, 1115-17, 122 L.Ed.2d 445 (1993); United States v. Pitz, 2 F.3d 723, 731 (7th Cir.1993); United States v. Rodriguez, 995 F.2d 776, 779 (7th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 648, 126 L.Ed.2d 605 (1993). A testifying witness commits perjury in federal court if she is under oath and "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory." Dunnigan, --- U.S. at ----, 113 S.Ct. at 1116; see also 18 U.S.C. Sec. 1621. We review a district court's finding of perjury for clear error. Pitz, 2 F.3d at 730.
 
 
 55
 In this case, the district judge held that Buitrago's trial testimony constituted perjury. Specifically, he found that two aspects of her trial testimony pivotal to her defense were so transparently false that he could come to no other conclusion than that she knowingly and intentionally lied under oath. The judge first found Buitrago's explanation that she owned a cellular telephone to communicate with David about her efforts to find a business location for him in Houston "simply ridiculous." The judge found it absurd that David would have been looking for a small business, that he could not search for himself given his frequent trips to Houston, and that he would have engaged Buitrago to conduct such a search. The judge also found patently false Buitrago's testimony that her frequent calls to Restrepo in Chicago were merely to discuss Restrepo's pregnancy, particularly since many of her calls to Restrepo lasted one minute or less.
 
 
 56
 On appeal, Buitrago argues only that the record does not support the court's finding of perjury. We do not agree. Except for the district court's inaccurate recollection of the type of business for which Buitrago claims she was searching for David,[14] the trial record supports all of the reasons given by the district court for its finding of perjury. While we are mindful of the significant impact of this sentencing adjustment on Buitrago's sentence,[15] we are also mindful of the district court's observation that Buitrago's testimony constituted "an exceptional instance of perjury." The court's decision to impose an obstruction of justice adjustment for Buitrago's perjury was not clearly erroneous. For this reason, we uphold Buitrago's sentence.
 
 
 57
 F. Maurice Elliott's Challenge to Jury Instructions
 
 
 58
 Tried separately from the other four defendants, Elliott raises only one issue in his appeal. He contends that the district court committed reversible error by failing to instruct the jury on his theory of defense. At trial, Elliott attempted to show through cross-examination, testimony, and argument that although he and fellow defendant Horton purchased narcotics from Hamdi, he never joined the charged conspiracy.
 
 
 59
 In support of his defense, Elliott submitted two jury instructions on conspiracy.[16] The district court rejected those instructions, finding them to be confusing, not helpful to the jury, and inappropriate comments on the evidence. Instead, the court chose two instructions (Instructions 19 and 20) which closely followed Seventh Circuit Pattern Instruction 5.11 on conspiracy and developed a third instruction (Instruction 30) with the assistance of both the government and Elliott's attorney to convey Elliott's theory of defense to the jury.[17] At no time during the instruction conference did Elliott's attorney object to the district court's chosen instructions.
 
 
 60
 On appeal, Elliott argues that his conviction must be reversed because the district court denied him the opportunity to present his theory of defense to the jury. As Elliott implicitly concedes, he did not properly preserve this issue for appeal. To preserve an objection to the district court's refusal to give a proposed instruction, the defendant must object on the record to the judge's refusal to tender his requested instructions and must clearly state his reason for the objection. Fed.R.Crim.P. 30; United States v. Douglas, 818 F.2d 1317, 1320 (7th Cir.1987) (citing United States v. Green, 779 F.2d 1313, 1320 n. 6 (7th Cir.1985)). Merely submitting the instruction is insufficient. Because Elliott failed to preserve his objection, we review his claim on appeal under a "plain error" standard. United States v. Starnes, 14 F.3d 1207, 1213 (7th Cir.1994); Douglas, 818 F.2d at 1320. Plain error is an error so egregious that a miscarriage of justice results. Starnes, 14 F.3d at 1213 (citations omitted).
 
 
 61
 The district court's instructions to the jury were not "plainly erroneous." While Elliott was entitled to jury instructions encompassing his defense, he was not entitled to have his particular instructions read to the jury. See Douglas, 818 F.2d at 1320. In this case, the court reviewed Elliott's submitted instructions and found them confusing, unhelpful and somewhat inappropriate. The district court also noted that "the essence of whatever is good about them is covered in the instructions that I am giving." We agree.
 
 
 62
 More so than Elliott's proposed instructions, Instructions 19 and 20 accurately stated the law of conspiracy in the Seventh Circuit, conveying to the jury both the essential elements the government must prove on a conspiracy charge and the circumstances under which a defendant can be found guilty of joining an illegal conspiracy. See e.g., United States v. Martinez de Ortiz, 907 F.2d 629 (7th Cir.1990), cert. denied, 498 U.S. 1029, 111 S.Ct. 684, 112 L.Ed.2d 676 (1991). Additionally, Instruction 30 fairly conveyed Elliott's defense theory to the jury by telling the jury that Elliott denies conspiring with "Ayyash and Horton to possess or distribute drugs and defends on the ground that he was in business for himself and had no joint interest with either Ayyash or Horton." In sum, the district court's instructions were accurate and adequate. Therefore, we affirm Elliott's conviction.
 
 III.
 
 63
 For all of the reasons given above, we AFFIRM the defendants' convictions and sentences.
 
 
 
 [1]
 Officer Ball is a member of a state trooper unit focused on drug interdiction
 
 
 [2]
 Mounts was then arrested and charged with possession of a controlled substance with intent to distribute. In a state court proceeding, Mounts moved to suppress the evidence. After a hearing, the state court denied the motion. At the time of his federal trial, the state charge was still pending
 
 
 [3]
 Because the police obtained information from Mounts' license in the first stop that formed the basis for their second stop, the court held that the admissibility of the later search depended on the legality of the first stop. We agree with the district court
 
 
 [4]
 Nevertheless, we agree that if Mounts had established that a large percentage of registered automobiles in Georgia did not appear on Georgia's computer system and that this fact was common knowledge among law enforcement personnel, the fact that his particular automobile was not registered might not be sufficiently probative to support Officer Ball's stop absent some other cause. However, Mounts did not make such a showing
 
 
 [5]
 The government offered tape recorded conversations of Restrepo attempting to purchase at least one kilogram of cocaine from a Miami man, Ralph Gonzalez, in Chicago in May 1984. The deal fell through after Gonzalez refused to hand over the cocaine to Restrepo without payment even though Restrepo insisted that her father had already paid for the cocaine
 
 
 [6]
 Mounts argues that the "vivid reenactment of Restrepo's alleged 1984 drug deal, punctuated with names, places, and descriptions was likely to create the impression with the jury that Restrepo, as well as her co-defendant[s], had the propensity to deal drugs." Buitrago asserts that "by attempting to make Restrepo look like a long time drug dealer, and then by trying to create a close relationship between Restrepo and Buitrago, the government was able to utilize this evidence to cast a shadow upon Buitrago's character as well as Restrepo's."
 
 
 [7]
 The Presentment Clause of the Fifth Amendment provides that "no person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury. U.S. Const. amend. V; see also United States v. Miller, 471 U.S. 130, 136, 105 S.Ct. 1811, 1815, 85 L.Ed.2d 99 (1985) (discussing the right to be tried on charges returned by a grand jury)
 
 
 [8]
 Fed.R.Crim.P. 16(a)(1)(B) provides:
 (B) Defendant's Prior Record. Upon request of the defendant, the government shall furnish to the defendant such copy of the defendant's prior criminal record, if any, as is within the possession, custody, or control of the government, the existence of which is known, or by the exercise of due diligence may become known, to the attorney for the government.
 
 
 [9]
 That criminal history consisted of two documents, a print-out of information maintained by the FBI in the National Crime Information Center ("NCIC") computers and a copy of Jamal's Chicago rap sheet
 
 
 [10]
 The district court concluded that Assistant United States Attorney Therese Cesar had not violated any pretrial duties because she made reasonable efforts to disclose Jamal's arrest record. At oral argument, Jamal's attorney argued vigorously that AUSA Cesar lied to the district court as to when she learned of Jamal's arrest record and that the district court's finding of no violation was in clear error. We do not agree. In addition to the great deference given to the district court's resolution of this issue, we note that our independent examination of the record does not correspond with the attorney's representations as to the order and timing of AUSA Cesar's explanations
 
 
 [11]
 Jamal complains that the timing of the government's notice of the Houston arrest hampered his ability to seek suppression of the evidence before trial and frustrated his defense strategy. Jamal's first complaint is trivial, given the district court's willingness to conduct a suppression hearing in the middle of trial. That Jamal may have preferred a pre-trial suppression hearing does not affect the adequacy of the remedy offered by the court
 His second complaint is no more substantial. Contrary to his repeated and vociferous assertions, Jamal did not argue that he had never been in Houston. Instead, he argued that the government would not offer any corroborating evidence demonstrating his presence in Houston. However, the government did offer corroborating evidence independent of the Houston arrest--documentation of a car rental using Jamal's driver's license in Houston during that same time period. Given this evidence, it stretches credulity for Jamal to insist that the arrest evidence destroyed his defense.
 
 
 [12]
 The district court found Buitrago responsible for 350 kilograms, Mounts for 180 kilograms, and Jamal for 50 kilograms
 
 
 [13]
 A "minimal participant" is a defendant who is "plainly among the least culpable of those involved in the conduct of the group." Such a defendant receives a four-level decrease. See U.S.S.G. Sec. 3B1.2(a) and comment., n. 1. A "minor participant" means "any participant who is less culpable than most other participants, but whose role could not be described as minimal." A minor participant receives a two-level reduction. See U.S.S.G. Sec. 3B1.2(b) and comment., n. 3. If a defendant falls in between these two definitions, he receives a three-level reduction
 
 
 [14]
 The district court stated that Buitrago testified to searching for a restaurant location for David Hamdan. In actuality, Buitrago testified that she was searching for a liquor store or convenience store location. This minor variance is inconsequential
 
 
 [15]
 The two-level adjustment added 57 months to Buitrago's sentence
 
 
 [16]
 Elliott's proposed defense instructions were taken in part from the Manual of Modern Criminal Instructions for the Ninth Circuit. Instruction Number Two stated:
 A conspiracy may continue for a long period of time and may include the performance of many transactions. It is not necessary that all members of the conspiracy join at the same time, and one may become a member of a conspiracy with full knowledge of all details of the unlawful scheme or the names, identities, or locations of all other members.
 Even though a defendant did not directly conspire with the other conspirators in the overall scheme, the defendant would, in effect, have agreed to participate in the conspiracy if it is proved beyond a reasonable doubt that: (1) the defendant directly conspired with one or more conspirators to carry out at least one of the objects of the conspiracy, (2) the defendant knew or had reason to know that other conspirators were involved with those with whom the defendant directly conspired, and (3) the defendant had reason to believe that whatever benefits the defendant might get from the conspiracy were probably dependent upon the success of the entire venture.
 Elliott's Instruction Number One included the above statements and added the following:
 The defendant's periodic purchase of unlawful substances from the same individual does not necessarily establish the defendant's agreement to participate in one of the objects of the overall conspiracy.
 The sale of unlawful substances to the defendant on credit does not necessarily establish the defendant's agreement to participate in one of the overall objects of the overall conspiracy.
 The defendant's participation in more than one illegal transaction with an acknowledged member of a conspiracy does not establish the defendant's agreement to participate in the conspiracy.
 
 
 [17]
 Instruction No. 30 read:
 I will describe for you the essential allegations of the conspiracy count so that you will know what it is the government is required to prove in regard to defendant Elliott. Count I of the indictment alleges that the defendant Elliott conspired with Hamdi Ayyash, Joseph Horton and others to possess cocaine and heroin for the purpose of distributing it and to actually distribute those drugs. The defendant denies that he conspired with Ayyash or Horton to possess or distribute drugs and defends on the ground that he was in business for himself and had no joint interest with either Ayyash or Horton.
 In order to prove the conspiracy alleged, the government must prove beyond a reasonable doubt that the defendant Elliott conspired with at least one of the named co-conspirators--that is, either Hamdi Ayyash or Joseph Horton--to possess and or distribute cocaine and/or heroin.
 Instruction No. 19 read:
 In order to prove a defendant guilty of the offense of conspiracy, the government must prove these elements beyond a reasonable doubt:
 
 
 [1]
 that the alleged conspiracy involving at least Ayyash or Horton existed;
 
 
 [2]
 that the defendant Elliott knowingly and intentionally became a member of the conspiracy
 If you find from your consideration of all evidence that each of these propositions has been proved beyond a reasonable doubt then you should find the defendant guilty.
 If, on the other hand, you find from your consideration of all of the evidence that either of these propositions has not been proved beyond a reasonable doubt, then you should find the defendant not guilty.
 Instruction No. 20 read:
 A conspiracy is an agreement between two or more persons to accomplish an unlawful purpose. A conspiracy may be established even if its purpose was not accomplished.
 In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all the circumstances and the conduct of all of the alleged participants.
 In determining whether the defendant whom you are considering became a member of the conspiracy, you may consider only the acts and statements of that particular defendant. You may consider statements by other persons in deciding what a particular defendant did or said or to help you understand a defendant's acts and statements.
 To be a member of the conspiracy, the defendant need not join at the beginning or know all the other members or the means by which the purpose was to be accomplished. However, the government must prove beyond a reasonable doubt, from the defendant's own acts and statements, that the defendant was aware of the common purpose and was a willing participant in the conspiracy.