**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RAMSES CORTEZ-GALAVIZ,

Defendant-Appellant.

No. 06-4230

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 2:05-CR-802-PGC)**

Submitted on the briefs:[*]

Deirdre A. Gorman, Ogden, Utah, for Defendant-Appellant.

Brett L. Tolman, United States Attorney, and Elizabethanne C. Stevens, Assistant United States Attorney, Salt Lake City, Utah, for Plaintiff-Appellee.

Before **O'BRIEN, McWILLIAMS**, and **GORSUCH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

_____

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. _See_ Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

Ramses Cortez-Galaviz contends that a traffic stop ultimately leading to his conviction for possession with intent to distribute illegal drugs was unreasonable under the Fourth Amendment. Specifically, Mr. Cortez-Galaviz maintains that the information on which the detaining officer relied to effect the stop – derived from a state computer system containing vehicle insurance and registration data – was too meager to give rise to reasonable suspicion of unlawful conduct, too unreliable, and too stale. We agree, however, with the district court that the information from the database provided objective, particularized, and, while perhaps not perfect or immediate, sufficient information to justify a brief traffic stop. Accordingly, we affirm.

I

As part of a stakeout coordinated by a Drug Enforcement Agency ("DEA") task force on October 20, 2005, Marcelo Rapela of the Midvale City, Utah police department stationed himself outside a duplex in Salt Lake City that, according to a confidential informant, housed a drug dealing operation. During the course of the stakeout, Officer Rapela saw Mr. Cortez-Galaviz speak with another person outside the duplex and then enter the front passenger door of a white Ford Explorer, after which the Explorer proceeded to drive away. Deciding to follow the vehicle, Officer Rapela typed its license plate information into his squad car

computer to check its registration and insurance status; shortly thereafter he received the following message, highlighted in red:

> INSURED/Not Found: AS OF/9/30/2005 Recommend request proof of insurance.

This is apparently one of at least three possible responses to an officer's computer search, the others being messages indicating that the vehicle either definitely is or definitely is not insured.[1]

The database queried by Officer Rapela is the product of a program, directed by the Utah State Legislature, to help law enforcement monitor compliance with state insurance requirements and assist in reducing the number of uninsured motor vehicles on the road. Utah Code Ann. § 41-12a-803(1)(a)-(b). Maintained by a third party agent, Insure-Rite, Inc. ("Insure-Rite"), the database matches insurance information provided by insurance companies with vehicle registration information provided by the Utah Motor Vehicle Division ("MVD"), and is audited at least annually for accuracy. Utah Code Ann. § 41-12a-803(5) & (8)(b).[2]

---

[1] Officer Rapela testified to his belief that there may be other possible responses as well, including that insurance had been revoked or expired as of a certain date.

[2] In 2005, at the time of the stop in this case, insurers had to supply new information about their insureds to Insure-Rite on a monthly basis, Utah Code Ann. § 31A-22-315(1)(a) (*amended by* 2006 Utah Laws c. 130, § 1, eff. July 1, 2006); effective July 1, 2006, the law was amended to ensure that non-commercial vehicle policies are reported by insurers twice a month, Utah Code

(continued...)

Officer Rapela testified that he takes the results of his database queries at face value and that his typical response to a "not found" message is to pull the vehicle over and ask the driver for proof of insurance; if the vehicle turns out to be insured, Officer Rapela recommends the individual take the information to the MVD to "allow them to update the system"; otherwise he issues the driver a citation. Following his usual practice, Officer Rapela stopped the Explorer to ask the driver about its insurance status. As he approached the vehicle, a passenger seated in the rear, Carlos Zepeta-Soto, started to reach underneath his seat. Officer Rapela asked Mr. Zepeta-Soto to keep his hands on the headrest in front of him, and Mr. Zepeta-Soto initially complied. The officer then asked the driver, Juan Carlos Reyes-Rubio, for his license, registration, and proof of insurance. Mr. Reyes-Rubio, however, had no license and started checking for registration and insurance information but, at this point, Mr. Zepeta-Soto removed his hands from the headrest and again reached under his seat. Officer Rapela, who was without backup at the time, grew concerned for his safety, opened the rear passenger door, and then saw drugs in plain view in the spot on the floor where

[2](...continued)
Ann. § 31A-22-315(2)(a). The MVD also was statutorily required to report its information at the time of Mr. Cortez-Galaviz's stop, though without any specified deadlines, Utah Code Ann. § 41-1a-120(1) (*amended by* 2006 Utah Laws c. 130, § 2, eff. July 1, 2006); as part of the 2006 amendments, however, this, too, changed and the MVD must now supply new registration information to Insure-Rite on a semi-monthly basis, Utah Code Ann. § 41-1a-120(1).

Mr. Zepeta-Soto had been reaching. Officer Rapela arrested Mr. Zepeta-Soto and, after conducting a further search and finding additional drugs, also took into custody both the driver and Mr. Cortez-Galaviz.

Eventually indicted on three counts of distributing controlled substances, Mr. Cortez-Galaviz filed a motion to suppress and, after the district court denied the motion, entered a conditional guilty plea while preserving his right to appeal the disposition of his suppression motion.

II

A

The only question presented to us on appeal is whether the initial traffic stop of the Explorer complied with the Fourth Amendment.[3] In approaching this question, we must, as in all appeals from a district court's order on a motion to suppress, view the record evidence in the light most favorable to the district court's ruling and accept its factual findings unless clearly erroneous, though we

---

[3] The government does not contest Mr. Cortez-Galaviz's standing under the Fourth Amendment to bring this limited challenge, and the Supreme Court recently decided a similar case, holding that a passenger was "seized" for Fourth Amendment purposes and thus had standing to challenge the validity of the traffic stop at issue, *Brendlin v. California*, ___ U.S. ___, 127 S. Ct. 2400, 2405 (2007), though the passenger's right to contest a subsequent search not of his or her person but the vehicle remains another question, *see Rakas v. Illinois*, 439 U.S. 128 (1978) (holding that a passenger who lacked a property or possessory interest in the automobile or property seized lacked standing to challenge a search of the car).

will assess *de novo* the legal question whether the search was "reasonable" under the Fourth Amendment. *United States v. Caro*, 248 F.3d 1240, 1243 (10th Cir. 2001). The Fourth Amendment test for assessing the reasonableness of traffic stops, in turn, tracks our test for investigative detentions – that is, a traffic stop will be held reasonable when, under the totality of the circumstances, the officer bears a "reasonable suspicion" that criminal activity "may be afoot." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotation and citations omitted).

To satisfy the reasonable suspicion standard, an officer must have a "particularized and objective" basis for thinking the detained individual is involved in criminal activity. *United States v. Cortez*, 449 U.S. 411, 417 (1981). This standard aspires to draw a line that at once protects the rights of individual citizens "against police conduct which is overbearing or harassing" and the "toll in human injury and frustration" such conduct imposes, *Terry v. Ohio*, 392 U.S. 1, 15 (1968), yet balances the social need for security, recognizing "the rapidly unfolding and often dangerous situations on city streets [where] the police are in need of an escalating set of flexible responses, graduated in relation to the amount of information they possess," *id.* at 10. As given to us, this standard requires an officer to have "some minimal level of objective justification," *INS v. Delgado*, 466 U.S. 210, 217 (1984), but he or she "need not rule out the possibility of innocent conduct as long as the totality of the circumstances suffices to form a

-6-

particularized and objective basis for a traffic stop." *United States v. Vercher*, 358 F.3d 1257, 1261 (10th Cir. 2004) (internal quotations and citation omitted). Thus, reasonable suspicion may be supported by "a showing considerably less than preponderance of the evidence." *Id.* at 1263 (internal quotation and citation omitted).

Governed by these legal standards, we find ourselves compelled to hold Officer Rapela's stop compliant with the Fourth Amendment on the record before us. The officer indeed had both particularized and objective information before him suggestive of a traffic violation. He was not, as Mr. Cortez-Galaviz, "merely viewing the [Explorer] through his windshield, wondering" about its insurance status as he might any other passing vehicle. Aplt.'s Opening Br. at 9. Rather, Officer Rapela knew, objectively and with particularity, that the state database maintained for the purpose of recording vehicle insurance information contained no information suggesting that the owner of the Explorer had insured it. He had reason, therefore, to pluck this needle from the haystack of cars on the road for investigation of a possible insurance violation.

To be sure, the "not found" response Officer Rapela received from the database did not as definitively indicate criminal activity as a "no" response, but neither did it equate to an exculpatory "yes," and the suggestive ambiguity of the particularized and objective information Officer Rapela had at hand justified his decision to warrant a brief traffic stop – even though it surely would not have

sufficed for an arrest. Indeed, the resolution of particularized and objective yet still ambiguous – potentially lawful, potentially unlawful – facts is the central purpose of an investigative detention. *See Illinois v. Wardlow*, 528 U.S. 119, 125 (2000) ("Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. . . . *Terry* recognized that the officers could detain the individuals to resolve the ambiguity."); *Terry*, 392 U.S. at 22 (recognizing "that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest").

In this respect, our case is not only controlled by the holdings of *Wardlow* and *Terry*, but may be analogized to their facts. In *Wardlow*, when the defendant saw officers drive by in a patrol car and look in his direction, he immediately fled; the Court explained that such flight "is not necessarily indicative of wrongdoing" but it is "certainly suggestive," and the very ambiguity of the situation allowed officers to pursue the issue by means of a brief stop. *Wardlow*, 528 U.S. at 124. In *Terry*, Officer McFadden, long familiar to all first year law students, saw two men hovering around a store window, gathering in small groups, walking away, and rejoining a couple blocks away. Equivocal though the situation surely was, the Court concluded that "[i]t would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery

from stores in this same neighborhood to have failed to investigate this behavior further." *Terry*, 392 U.S. at 23.

Our own case law holds close analogies as well. In *Oliver v. Woods*, 209 F.3d 1179 (10th Cir. 2000), for example, we confronted a claim for damages in which the defendant police officer encountered the plaintiff before business hours in the parking lot of an auto repair shop. The parking lot had been the site of illegal dumping, and the officer had been called to the scene after the plaintiff activated a silent motion alarm on the property. Though the officer conceded that all of the plaintiff's actions were (and ultimately proved to be) consistent with innocent conduct, the circumstances were sufficiently ambiguous that, we held, the officer had reasonable grounds to detain the plaintiff briefly "to ascertain the reason for his presence in the parking lot." *Id.* at 1187.

B

Mr. Cortez-Galaviz responds to this, first, by emphasizing that the Insure-Rite database reflects only whether an owner has obtained insurance for his or her vehicle; it does not reflect whether a non-owner driver, like Mr. Reyes-Rubio here, has independent insurance that might cover the operation of someone else's vehicle. Aplt.'s Reply Br. at 2-3. And this is significant, Mr. Cortez-Galaviz tells us, because Utah law permits the operation of motor vehicles either when the owner obtains insurance for the vehicle or when a non-owner driver independently carries insurance covering him or her even when operating a

vehicle the owner has failed to insure. In response, the government disputes this interpretation of Utah law, arguing that an owner violates the statute if his or her vehicle is uninsured, even if a non-owner driver has covering insurance.

We see no need, however, to enter the thickets of Utah insurance law to resolve this argument. Even assuming without deciding that driver-based insurance would have been sufficient to comply with Utah's statutes, Mr. Cortez-Galaviz's argument overstates the requirements for reasonable suspicion under the Fourth Amendment. We evaluate Officer Rapela's conduct "in light of common sense and ordinary human experience," *United States v. Stephenson*, 452 F.3d 1173, 1176 (10th Cir. 2006) (internal quotations and citation omitted), and common sense and ordinary experience suggest that a vehicle's owner is, while surely not always, very often the driver of his or her own car. Thus, the circumstance here presented a reasonable basis for suspecting that a traffic infraction existed sufficient to warrant investigation. *See generally Delaware v. Prouse*, 440 U.S. 648, 663 (1979) (requiring "at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law" to support random, investigative traffic stops). To require an officer to know both the identity of the driver as well as the vehicle's insurance status would take us from *Terry*, *Wardlow*, and *Oliver*'s authorization to investigate equivocal facts and into the land of requiring an officer to have probable cause

before effecting any stop. Neither, along these same lines, does Mr. Cortez-Galaviz suggest how an officer might practicably and safely divine the identity of a driver of a moving vehicle. Reasonable suspicion requires a dose of reasonableness and simply does not require an officer to rule out every possible lawful explanation for suspicious circumstances before effecting a brief stop to investigate further.[4]

C

Mr. Cortez-Galaviz next contends that Insure-Rite's computer database "frequently" gives incorrect information and, thus, could not be reasonably relied upon in effecting the traffic stop. Aplt.'s Reply Br. at 7; *see also* Aplt.'s Opening Br. at 4. But given the limited evidence in this record, and viewing it in the light most favorable to the district court's decision as we must, we are unable to agree.

First, Mr. Cortez-Galaviz points to the fact that Officer Rapela testified he has on "several occasions" stopped people after receiving a "not found" response only to determine they actually had insurance. But there is no further elaboration in the record before us regarding the frequency with which such encounters occurred and, as Officer Rapela indicated that he stops approximately 200 people

_____

[4] Relatedly, Mr. Cortez-Galaviz maintains that Officer Rapela misunderstood Utah's insurance laws and that reasonable suspicion cannot be based on this alleged misunderstanding of the law. *See* Aplt.'s Opening Br. at 18-19. As we explained above, however, reasonable suspicion existed even under Mr. Cortez-Galaviz's proffered interpretation of Utah law; therefore, any alleged misunderstanding by Officer Rapela was immaterial.

a month, evidence suggesting that he has encountered errors on "several occasions" tells us little about the frequency of error in the database's information.

Second, Mr. Cortez-Galaviz claims he can demonstrate that the database has an error rate of approximately 40 percent, deriving this figure from the fact that, out of the 21 queries made by all police officers to the database around the same time as Officer Rapela's query on the Explorer, the database returned 9 "not found" responses. No evidence was introduced, however, indicating how many of the 9 "not found" responses actually involved insured vehicles. Accordingly, as the district court observed, Mr. Cortez-Galaviz's evidence hardly suggests 40 percent error rate. All we know is that 40 percent of the vehicles at issue were categorized "not found," and that is quite a different thing – and perhaps particularly so given the exceedingly small sample size, which does not appear to be statistically significant.

Third, Mr. Cortez-Galaviz contends the unreliability of the database is demonstrated by the fact that insurance for the Explorer existed as early as May 2005 and that the database failed to reflect this fact at the time of the stop. Mr. Cortez-Galaviz did not, however, raise this argument before the district court or prepare a factual record sufficient for us to resolve it on appeal, and so we deem it waived. *See United States v. Hernandez-Rodriguez*, 352 F.3d 1325, 1328 (10th

Cir. 2003) ("Ordinarily, appellate courts will not consider arguments for the first time on appeal, and can do so only if the record is sufficiently developed.").

The record before us does suggest that the Explorer was insured by some unidentified person in May 2005, and that, pursuant to Insure-Rite's ordinary practices, the information was not entered into its database until a vehicle registration was received from MVD matching this same person – something that apparently took place shortly after the stop at issue in this case. But these threadbare facts raise more questions than they answer. For example: Was the registration information delayed because of the MVD? Or did fault lie perhaps with the vehicle owner who, for example, may have failed to register the purchase of the Explorer in a timely fashion? What reasons led Insure-Rite to wait to enter insurance information for a vehicle until it has matching registration information? Is that practice reasonable under the Fourth Amendment? Even if not, would or would not a police officer in Officer Rapela's position have resort to the good faith exception? While a demonstration that the Insure-Rite database is unreliable might well form a persuasive basis for a suppression motion, on the undeveloped record afforded us we simply cannot cogently approach, let alone answer, any of these, or other, questions essential to the disposition of Mr. Cortez-Galaviz's argument.

D

Finally, Mr. Cortez-Galaviz complains that, whatever else one might say about the information on which Officer Rapela relied, the "no information found" alert issued by Insure-Rite in this case was 20 days old, dated September 30, 2005. Aplt.'s Opening Br. at 12-13; Aplt.'s Reply Br. at 8-9. In assessing this argument, we note at the outset that timeliness of information is but one of many factors in the mix when assessing whether reasonable suspicion for an investigatory detention exists, and the relative importance of timeliness in that mix depends on the nature of the criminal activity at issue. *See, e.g., United States v. Cantu*, 405 F.3d 1173, 1177 (10th Cir. 2005). Thus, for example, when the legal infraction at issue typically wears on for days or weeks or months (like, say, driving without a license or appropriate emissions and safety certifications), rather than concludes quickly (like, say, jaywalking or mugging), the timeliness of the information on which the government relies to effect an investigative detention "recedes in importance" compared to other factors, such as the type and duration of offense at issue. *Id.*; *see also United States v. Mathis*, 357 F.3d 1200, 1207 (10th Cir. 2004) (noting that "ongoing and continuous activity makes the passage of time less critical when judging the staleness of information" (internal quotation omitted)).

Here, Officer Rapela's stop was aimed at investigating a possible violation of Utah's vehicle insurance laws, an offense that neither party argues is transitory in nature. He indisputably relied on the most current information available to a

-14-

patrolling officer. And Mr. Cortez-Galaviz offers us no other evidence or argument to suggest that reliance on a 20 day old alert is in any way or wise unreasonable given the nature of available technology, the offense or detention at issue, or the practical challenges associated with coordinating the dissemination of registration and insurance information for every motor vehicle on the road. Under these circumstances and on this record, therefore, we agree with the district court that a delay of 20 days between an alert and an officer's inquiry does not, by and of itself, nullify a traffic stop on the basis of a "not found" insurance report.

Our sister circuits have confronted similar questions and resolved them much as we do the one now before us. The Sixth Circuit, for example, has held three week old information about the status of a driver's license to be sufficiently current to provide reasonable suspicion regarding the commission of the offense of driving with a suspended license. *See United States v. Sandridge*, 385 F.3d 1032, 1036 (6th Cir. 2004). The First Circuit has found that information even five months old can still contribute to the mix of information sufficient to establish reasonable suspicion for an "ongoing" traffic offense when there is some additional indication of its reliability. *United States v. Pierre*, 484 F.3d 75, 84 (1st Cir. 2007) (finding information about a suspended license five months old was sufficient for reasonable suspicion based in part on "testimony suggest[ing] that Pierre's license was suspended on an ongoing basis, rather than for a short

period of time, making the suspicion that it was still inactive some five months later more reasonable").[5] Of course, outer boundaries exist for the usefulness of data, even for offenses typically protracted and ongoing in nature, *see*, *e.g.*, *United States v. Laughrin*, 438 F.3d 1245, 1248 (10th Cir. 2006) (22-week-old information about a defendant driving on a suspended license was too dated without additional indicia of reliability), but we need say no more to resolve Mr. Cortez-Galaviz's argument and this appeal than that we see no basis, on the record before us, to find that 20 days approaches that boundary for a vehicle insurance infraction.

Mr. Cortez-Galaviz replies that when Insure-Rite issues a "not found" alert it may, in turn, depend on insurance information as old as 90 days. But the evidence on which Mr. Cortez-Galaviz relies, taken from his private investigator,

---

[5] *See also United States v. Yusuf*, 461 F.3d 374, 391 (3d Cir. 2006) (noting in a challenge to information several years old contained in a money laundering search warrant affidavit "that the mere passage of time" does not necessarily make information stale when "the facts suggest that the activity is of a protracted and continuous nature"); *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (explaining that looking at time alone was not sufficient to determine if information several years old could still be relevant in a search warrant for child pornography since "the nature of the unlawful conduct is helpful in determining whether the information is stale, as is whether the supporting affidavit depicts continuing conduct or isolated and random instances of illegal conduct."); *United States v. Stevens*, 439 F.3d 983, 988 (8th Cir. 2006) (finding that information supplied within the preceding 72 hours contained in a search warrant for narcotics was not necessarily stale based just on the time delay and noting that "[w]e have no 'fixed formula' for deciding when information has become stale, but we consider the nature of the crime being investigated and the property to be searched").

indicates that when Insure-Rite does not have matching insurance information for a vehicle provided by the insurance companies, it can take the company up to 90 days to contact registered owners directly through the mail in an effort to obtain information about their insurance status before firmly reporting in its database that a vehicle has *no* insurance. This testimony simply does not speak to the age of the information on which Insure-Rite relies when issuing a more equivocal alert, as it did here on September 30, indicating that insurance information matched to a valid registration cannot be found. In fact, we are cited to nothing in the record that might resolve the question how long it takes Insure-Rite to issue such a report, and if Mr. Cortez-Galaviz had presented evidence that the information relied on by Officer Rapela was significantly older than 20 days, we might well have been confronted with a very different case. But as judges in the American system of justice we decide cases based on their records, and the record in this case does not support Mr. Cortez-Galaviz's contention. *See* 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure*: Evidence 2d § 5122 at 394 (2d ed., 2005) ("Under the American system of party initiation and party presentation . . . one or both of the parties must bring their dispute to court and they must provide the 'facts' needed for the resolution of the dispute.").

*   *   *

On the record before us, and without expressing views on what we might conclude if and when presented with a different record, we hold that a "not found" report from the Utah state insurance database, updated approximately 20 days earlier, suffices to afford a sufficiently particularized and objective basis to believe that a vehicle fails to comply with Utah vehicle insurance laws and, thus, to support a brief traffic stop.

*Affirmed.*