NO. 07-09-00289-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL A

 

 MARCH 25, 2010



 



 

JUAN LUIS CONTRARAS, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 



 

 FROM THE 69TH DISTRICT COURT OF HARTLEY
COUNTY;

 

NO. 1017H; HONORABLE RON ENNS, JUDGE



 



 

Before CAMPBELL
and HANCOCK and PIRTLE, JJ.

 

 

 

MEMORANDUM OPINION

 

Appellant Juan
Luis Contraras appeals from his conviction for
possession of methamphetamine with intent to deliver and the resulting sentence
of ten years of imprisonment.  Through
one issue, appellant contends the trial court erred in denying his motion to
suppress.  We agree, reverse the trial
court’s judgment and remand the cause to the trial court.

 

Background

On August 13,
2009, appellant plead guilty to possession of methamphetamine, with intent to
deliver, in an amount of four grams or more but less than 200 grams.[1]   On August 17, 2009, the trial court
certified appellant's right to appeal pre‑trial rulings made in his
case.  Appellant timely appealed the
trial court's denial of his motion to suppress.

Appellant’s motion
to suppress was heard at the same time as a similar motion filed by the
passenger in the car appellant was driving at the time of his arrest.  The same evidence applies to both motions,
and the trial court denied both motions. 
We reversed the trial court’s denial of the passenger’s motion to
suppress. See Gonzales-Gilando v. State, No. 07-09-0290-CR, 2010 Tex.App. LEXIS 949 (Tex.App.—Amarillo
February 10, 2010).  We will apply a
similar analysis here.

At the motion to
suppress hearing, Department of Public Safety troopers Foster and Gamez testified they were patrolling U.S. 385 in Hartley
County on November 19, 2008.  Foster
agreed that U.S. 385 is a main route for drug trafficking through Hartley
County.  The troopers, traveling south, met
appellant's 1999 Chevy Lumina at the south limits of Channing, Texas.  Trooper Foster testified he noticed
appellant's car as it passed because it was "an older model vehicle"
and "it was really clean.  There was
no road grime or dirt on it.  It had been
recently washed."  He agreed with
the State that this is one indicator to watch for with regard to drug
trafficking.  He also noted that when the
cars passed, appellant and his passenger quickly and simultaneously looked to
their right, away from the troopers. The troopers turned around.  Foster said appellant “[came] . . . almost to
a complete stop” at a blinking caution light at an intersection in
Channing.  Appellant continued north,
driving cautiously and keeping his speed well under the speed limit.  Appellant tapped his brakes as he drove, a
behavior Foster testified was “an indication of extreme nervousness, and it
just raises our suspicion.”  The trooper
also testified that when he first saw appellant and his passenger, their hats “were
canted to the side and--” … “as they met us, they turned them around.”  The trooper agreed with the prosecutor that
this behavior could indicate criminal activity. 
The trooper also testified that the two men did not "quite fit the
vehicle" because they were "younger individuals." 

Foster testified
these factors gave him a reasonable suspicion of criminal activity, but he also
agreed with the prosecutor that a DPS policy prevented him from making the
traffic stop based only on his reasonable suspicion when he had not observed a
traffic offense.  As the troopers
continued to follow appellant, with their in-vehicle computer they were given
information the vehicle’s registration was current but the insurance
information was unavailable.  Trooper Gamez testified similarly.

The troopers made
contact with Hartley County deputy sheriff Fowler, who was north of their
position on the highway, to get a "third set of eyes" on
appellant.  They told Fowler of their
observations of appellant and his passenger, and he also checked on the
vehicle’s registration and insurance.  He
also found the insurance information “not available.”[2]
 Fowler conducted a traffic stop of
appellant.  Fowler testified he believed
he was entitled to stop the vehicle to check the validity of the automobile
insurance.  

Analysis

We review a trial
court's ruling on a motion to suppress under a bifurcated standard of review,
giving almost total deference to a trial court's determination of historical
facts and reviewing de novo the court's application of the law Wiede v. State, 214 S.W.3d 17, 24‑25 (Tex.Crim.App. 2007); Maxwell v. State, 73 S.W.3d
278, 281 (Tex.Crim.App. 2002); Guzman v. State,
955 S.W.2d 85, 87‑90 (Tex.Crim.App. 1997).
When, as here, findings of fact are neither requested nor filed, we view the
evidence in the light most favorable to the trial court's ruling and assume
that the trial court made implicit findings of fact that support its ruling as
long as those findings are supported by the record. Ford v. State, 158
S.W.3d 488, 493 (Tex.Crim.App. 2005). 

The principles of Terry v. Ohio
are applicable to traffic stops.  Richardson v. State, 39 S.W.3d 634, 637
(Tex.App.—Amarillo 2000, no pet.), citing United States v. Brignoni-Ponce,
422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); see
Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); St. George v. State, 237 S.W.3d 720 (Tex.Crim.App. 2007). 
Consistent
with the principles set forth in Terry v. Ohio, a police officer lawfully may stop and briefly detain a person for investigative purposes if the officer has
a reasonable
suspicion supported by articulable
facts that criminal activity may be afoot, even
if the officer lacks
evidence rising to the level of probable cause. State v. Arriaga, 5 S.W.3d 804, 805 (Tex.App.—San Antonio
1999, pet. ref’d). Under Terry, an investigative detention
is reasonable,
and therefore constitutional, if (1) the officer's action was justified at the detention's inception; and (2) the detention
was reasonably related in scope to the circumstances that justified the
interference in the first place. Haas v. State, 172 S.W.3d 42, 50-51 (Tex. App.--Waco 2005, pet. ref'd). For the officer's initial action to be
justified under the first prong, the State must demonstrate that there
"existed specific, articulable facts that, taken
together with rational inferences from those facts, reasonably warranted that
intrusion." Id. at 51. The officer must have “a reasonable suspicion
that some activity out of
the ordinary is occurring or has occurred, some suggestion to connect the
detainee with the unusual activity, and some indication that the
unusual activity is
related to crime." Davis v. State, 947 S.W.2d 240, 244 (Tex.Crim.App. 1997), quoting Meeks v. State, 653 S.W.2d 6, 12 (Tex.Crim.App.
1983). The facts known
to the officer must amount to more than a hunch or suspicion.  Davis, 947 S.W.2d at 240.  In determining whether the officer's
suspicion was reasonable, we employ an objective standard asking whether the
facts available to the officer at the moment of detention warrant a person of
reasonable caution to believe that the action taken was appropriate. See Terry, 392 U.S. at 21‑22; Hernandez v. State,
983 S.W.2d 867, 869 (Tex.App.‑‑Austin
1998, pet. ref'd) (quoting Davis, 947 S.W.2d
at 243). The State need not establish with absolute certainty that a
crime has occurred in order to establish reasonable suspicion. Garcia v. State, 43 S.W.3d 527, 530 (Tex.Crim.App.
2001).  Police officers may
justifiably make inferences from visual observations based on their experiences
in law enforcement.  Bass v. State,
64 S.W.3d 646, 650 (Tex.App.-‑Texarkana 2001,
pet. ref'd). 
Also, facts giving rise to reasonable suspicion may be supplied by
information from another person. Brother
v. State, 166 S.W.3d 255, 257 (Tex.Crim.App.
2005).    

The State argues
the officers’ observations provide specific articulable
facts supporting their reasonable suspicion of appellant’s involvement in
criminal activity.  The State points out
that, on a U.S. highway on which drug trafficking was common, officers observed
(1) appellant=s vehicle was clean with no road grime;[3]
(2) when appellant passed the troopers, both he and his passenger quickly and
simultaneously looked to the right, away from the troopers; (3) appellant and
his passenger adjusted their caps and posture when they saw the troopers; (4)
appellant almost completely stopped at a blinking caution light when no other
vehicles were around; (5) after the troopers turned around to follow him,
appellant drove cautiously, keeping his speed under the speed limit and using
his brakes often; and (6) appellant and his passenger were Ayounger
individuals@ and did not match the Aolder model@ 1999 Chevrolet
Lumina.  As in Gonzales-Gilando, we find that the
conduct of appellant and his passenger to which the troopers testified, and
reasonable inferences from those facts, did not give rise to a reasonable
suspicion that appellant was engaged, had engaged, or was about to engage in
criminal conduct.  Gonzales-Gilando,
2010 Tex.App. LEXIS 949, *4.
Perhaps the circumstances, viewed in their totality and in the light most
favorable to the court’s ruling, give rise at most to a reasonable suspicion
something out of the ordinary was occurring, but we are unable to agree they
form the basis for a reasonable suspicion criminal activity was afoot.  See
Viveros v. State, 828 S.W.2d 2, 4 (Tex.Crim.App. 1992) (court unwilling to find that driving
as defendant did after passing patrol car Awell within the
speed limit@ was suspicious activity creating a
reasonable belief that activity is related to crime). See also Ford, 158 S.W.3d at 493
(officer’s testimony defendant was “following too close” insufficient basis for
finding reasonable suspicion); Loesch v.
State, 979 S.W.2d 47, 52, 53 (Tex.App.BCorpus
Christi 1998, no pet.) (vehicle was illegally
detained where suspicion derived exclusively from facts concerning defendant’s
location, that he drove an older vehicle that looked weighed down, and that he
did not look at the officers when he drove past them).  

The State also
contends officers were given a reasonable suspicion appellant was driving an
uninsured vehicle by the information relayed through their computers.  It is a misdemeanor offense to operate a
motor vehicle that is not covered by valid motor vehicle liability insurance or
some other means of establishing “financial responsibility.” See Tex.
Transp. Code Ann. § 601.191 (Vernon 1999). 
If the relayed information gave officers a reasonable suspicion
appellant was driving without liability insurance coverage, the deputy’s stop
of appellant was lawful.

In 2005, the Legislature directed the
creation of a program for the verification of vehicle owners’ compliance with
financial responsibility laws, intended to reduce the number of uninsured
motorists in Texas.  Tex. Transp. Code
Ann. § 601.452 (Vernon 
Supp. 2009).  The
legislation required information from insurance companies issuing motor vehicle
liability policies in Texas.  Tex. Transp. Code Ann. § 601.454 (Vernon Supp. 2009).  

As the legislation required, the
implementing agencies adopted regulations to implement the Financial
Responsibility Verification Program.  See 28 TAC § 5.601-5.611 (Vernon 2006)
(regulations of the Texas Department of Insurance).  The regulations required insurance companies
to submit data on personal auto insurance policies in force in Texas to a
database weekly, or to make the data available via an approved web-based
system.  28 TAC §§
5.604, 5.606.  The regulations
specify requirements for correcting errors and maintaining the accuracy of policy
information.  28 TAC §
5.605.  The regulations also
required that insurers providing information to the database meet and maintain
a 95 percent “match rate” beginning January 1, 2008, and a 98 percent rate
beginning January 1, 2010.  

In Gonzales-Gilando,
we rejected the State’s contention the officers had reasonable suspicion
appellant was driving without insurance. 
We are not persuaded to a different conclusion by the State’s further
arguments in this case.  At oral
argument, the State brought Brown v. State, 986 S.W.2d 50 (Tex.App.--Dallas 1999, no pet.), to our attention.  In Brown,
Dallas police officers arrested the defendant solely because he was driving a
vehicle listed as stolen by the National Crime Information Center (NCIC)
computer.  Brown, 986 S.W.2d at 51.  The appellate court found the listing gave
officers probable cause for his warrantless arrest for unauthorized use of a
motor vehicle.  Id. at 54.   In support of its conclusion, the court
cited other instances in which courts had upheld police reliance on NCIC
stolen-vehicle information.  Id. at 52.  Concluding its discussion of the
reasonableness of the Dallas officers’ reliance on the NCIC information, the
court found the record before it provided “no reason to question whether stolen
vehicle information obtained from the NCIC is reasonably trustworthy.” (Italics in original).
Id. at 54. 

Two factors
distinguish the case at bar from Brown.  First, in Brown the vehicle the defendant was driving was listed as
stolen.  Brown, 986 S.W.2d at 51.  Here, it is unclear what information, if any,
was conveyed to the officers about appellant’s compliance with vehicle
insurance requirements.  As noted, the
officers said the insurance information was “unavailable.”  Deputy Fowler also once used the word Aundocumented@ with regard to
appellant’s insurance.  But in this
context those terms are not self-explanatory. 
The record gives us no explanation of their meaning, and we are
unwilling to speculate on them.  The
Department of Insurance regulations for web-based compliance speak of
“affirmative” and “negative” responses to inquiries.  29 TAC § 5.608.  Even viewed in the light most favorable to
the trial court’s ruling, the responses the officers described here give no
reasonable basis for an inference appellant’s car was not insured.       

Second, the court
in Brown was satisfied that the NCIC
system had an operating history demonstrating the reasonableness of police
reliance on the information it provided. 
Brown, 986
S.W.2d at 54.  The record before us
contains no such information on the Financial Responsibility Verification
Program.[4]
 The State would have us rely on
the agency regulations mandating a certain level of accuracy, but, as we said
in Gonzales-Gilando,
nothing in the record shows those requirements have been met. Gonzales-Gilando,
2010 Tex.App. LEXIS 949,
*9 n.3.     

            The State also has cited United States v. Cortez-Galaviz,
495 F.3d 1203 (10th Cir. 2007). 
There, the court found a Utah state computer system containing vehicle
insurance and registration data provided sufficient information to justify a
traffic stop.  The officer stopped the
vehicle when, in response to his computer inquiry about its registration and
insurance status, he received a message, highlighted in red, reading
“INSURED/Not Found: AS OF /9/30/2005 Recommend request proof of
insurance.”  Id. at 1204.   Evidence showed the message apparently was
one of at least three possible responses to an officer’s computer search, the
others being messages indicating that the vehicle definitely was or was not
insured.  Id.  The court characterized
the computer response as telling the officer that “the state database
maintained for the purpose of recording vehicle insurance information contained
no information suggesting that the owner of the [vehicle] had insured it,” and
found the information gave the officer reason to stop the vehicle for
investigation of a possible insurance violation.  Id.


Without an
understanding of what the terms mean under the nomenclature of our state’s
insurance verification program, we cannot agree the “unavailable” or
“undocumented” responses the officers described here are the equivalent of that
in Cortez-Galaviz.  As the court there noted, the response fairly
conveyed a negative implication regarding the defendant’s compliance with
Utah’s requirements. 495 F.3d at 1204.  The same is not true here.  Deputy Fowler testified that the response he
once described as “undocumented” led him to believe the vehicle did not have insurance.  Without some foundation for that conclusion,
however, we cannot accept it as reasonable. 
As we noted also in Gonzales-Gilando, one of the troopers agreed the response he
received indicated, “they could have insurance or they
may not have insurance.”  While
undoubtedly accurate, the statement could be made of any vehicle on the
road.  

Accepting the
officers’ testimony in the light most favorable to the trial court’s ruling,
and deriving from the testimony every reasonable inference, we nonetheless must
conclude the officers had no reasonable suspicion appellant was operating a
motor vehicle without valid liability insurance, or that criminal activity was
otherwise afoot.  The trial court erred
by failing to grant appellant’s motion to suppress.

Denial of the
motion to suppress led to admission of the evidence that officers found drugs
in appellant’s car.  As in Gonzales-Gilando,
we find the trial court’s erroneous denial of the motion was harmful.  Tex. R. App. P. 44.2.  

We sustain
appellant=s issue, reverse the trial court’s
judgment and remand the cause to the trial court. 

                                                                                                

James T.
Campbell

                                                                                                            Justice

Publish.

 

 

 

            








 











[1]  See Tex. Health & Safety Code Ann.
§ 481.115(d) (Vernon 2003). This is a second degree felony punishable by
imprisonment for a term of not more than 20 years or less than 2 years and a
fine not to exceed $10,000.  Tex. Penal Code Ann. § 12.33 (Vernon 2003). 





[2]
Deputy Fowler also once used the term
“undocumented” with regard to the insurance information his computer gave him.





[3]
One trooper explained that drug
traffickers frequently wash their vehicles because they are “so concerned about
fingerprints and evidence . . . in every other town or so, they’ll stop and
wash their vehicle. So that’s the reason – that’s another indicator we look for
clean vehicles.”





[4]
Deputy Fowler estimated the insurance information
began appearing on his in-vehicle computer in September or October, before his
stop of appellant in November.