NO. 07-09-00289-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MARCH 25, 2010

JUAN LUIS CONTRARAS, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

FROM THE 69TH DISTRICT COURT OF HARTLEY COUNTY;

NO. 1017H; HONORABLE RON ENNS, JUDGE

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant Juan Luis Contraras appeals from his conviction for possession of methamphetamine with intent to deliver and the resulting sentence of ten years of imprisonment. Through one issue, appellant contends the trial court erred in denying his motion to suppress. We agree, reverse the trial court's judgment and remand the cause to the trial court.

Background

On August 13, 2009, appellant plead guilty to possession of methamphetamine, with intent to deliver, in an amount of four grams or more but less than 200 grams.[1]  On August 17, 2009, the trial court certified appellant's right to appeal pre-trial rulings made in his case.  Appellant timely appealed the trial court's denial of his motion to suppress.

Appellant's motion to suppress was heard at the same time as a similar motion filed by the passenger in the car appellant was driving at the time of his arrest.  The same evidence applies to both motions, and the trial court denied both motions.  We reversed the trial court's denial of the passenger's motion to suppress. *See Gonzales-Gilando v. State,* No. 07-09-0290-CR, 2010 Tex.App. LEXIS 949 (Tex.App.—Amarillo February 10, 2010).  We will apply a similar analysis here.

At the motion to suppress hearing, Department of Public Safety troopers Foster and Gamez testified they were patrolling U.S. 385 in Hartley County on November 19, 2008.  Foster agreed that U.S. 385 is a main route for drug trafficking through Hartley County.  The troopers, traveling south, met appellant's 1999 Chevy Lumina at the south limits of Channing, Texas.  Trooper Foster testified he noticed appellant's car as it passed because it was "an older model vehicle" and "it was really clean.  There was no road grime or dirt on it.  It had been recently washed."  He agreed with the State that this is one indicator to watch for with regard to drug trafficking.  He also noted that when

---

[1]  *See* Tex. Health & Safety Code Ann. § 481.115(d) (Vernon 2003). This is a second degree felony punishable by imprisonment for a term of not more than 20 years or less than 2 years and a fine not to exceed $10,000.  Tex. Penal Code Ann. § 12.33 (Vernon 2003).

the cars passed, appellant and his passenger quickly and simultaneously looked to their right, away from the troopers. The troopers turned around. Foster said appellant "[came] . . . almost to a complete stop" at a blinking caution light at an intersection in Channing. Appellant continued north, driving cautiously and keeping his speed well under the speed limit. Appellant tapped his brakes as he drove, a behavior Foster testified was "an indication of extreme nervousness, and it just raises our suspicion." The trooper also testified that when he first saw appellant and his passenger, their hats "were canted to the side and--" … "as they met us, they turned them around." The trooper agreed with the prosecutor that this behavior could indicate criminal activity. The trooper also testified that the two men did not "quite fit the vehicle" because they were "younger individuals."

Foster testified these factors gave him a reasonable suspicion of criminal activity, but he also agreed with the prosecutor that a DPS policy prevented him from making the traffic stop based only on his reasonable suspicion when he had not observed a traffic offense. As the troopers continued to follow appellant, with their in-vehicle computer they were given information the vehicle's registration was current but the insurance information was unavailable. Trooper Gamez testified similarly.

The troopers made contact with Hartley County deputy sheriff Fowler, who was north of their position on the highway, to get a "third set of eyes" on appellant. They told Fowler of their observations of appellant and his passenger, and he also checked on the vehicle's registration and insurance. He also found the insurance information "not

3

available."[2] Fowler conducted a traffic stop of appellant. Fowler testified he believed he was entitled to stop the vehicle to check the validity of the automobile insurance.

## Analysis

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to a trial court's determination of historical facts and reviewing de novo the court's application of the law *Wiede v. State,* 214 S.W.3d 17, 24-25 (Tex.Crim.App. 2007); *Maxwell v. State,* 73 S.W.3d 278, 281 (Tex.Crim.App. 2002); *Guzman v. State*, 955 S.W.2d 85, 87-90 (Tex.Crim.App. 1997). When, as here, findings of fact are neither requested nor filed, we view the evidence in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings of fact that support its ruling as long as those findings are supported by the record. *Ford v. State,* 158 S.W.3d 488, 493 (Tex.Crim.App. 2005).

The principles of *Terry v. Ohio* are applicable to traffic stops. *Richardson v. State*, 39 S.W.3d 634, 637 (Tex.App.—Amarillo 2000, no pet.), *citing United States v. Brignoni-Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); s*ee Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *St. George v. State*, 237 S.W.3d 720 (Tex.Crim.App. 2007). Consistent with the principles set forth in *Terry v. Ohio*, a police officer lawfully may stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks evidence rising to the level of probable

---

[2] Deputy Fowler also once used the term "undocumented" with regard to the insurance information his computer gave him.

cause. *State v. Arriaga*, 5 S.W.3d 804, 805 (Tex.App.—San Antonio 1999, pet. ref'd). Under *Terry*, an investigative detention is reasonable, and therefore constitutional, if (1) the officer's action was justified at the detention's inception; and (2) the detention was reasonably related in scope to the circumstances that justified the interference in the first place. *Haas v. State*, 172 S.W.3d 42, 50-51 (Tex. App.--Waco 2005, pet. ref'd). For the officer's initial action to be justified under the first prong, the State must demonstrate that there "existed specific, articulable facts that, taken together with rational inferences from those facts, reasonably warranted that intrusion." *Id.* at 51. The officer must have "a reasonable suspicion that some activity out of the ordinary is occurring or has occurred, some suggestion to connect the detainee with the unusual activity, and some indication that the unusual activity is related to crime." *Davis v. State*, 947 S.W.2d 240, 244 (Tex.Crim.App. 1997), *quoting Meeks v. State*, 653 S.W.2d 6, 12 (Tex.Crim.App. 1983). The facts known to the officer must amount to more than a hunch or suspicion. *Davis,* 947 S.W.2d at 240. In determining whether the officer's suspicion was reasonable, we employ an objective standard asking whether the facts available to the officer at the moment of detention warrant a person of reasonable caution to believe that the action taken was appropriate. *See Terry*, 392 U.S. at 21-22; *Hernandez v. State*, 983 S.W.2d 867, 869 (Tex.App.--Austin 1998, pet. ref'd) (*quoting Davis,* 947 S.W.2d at 243). The State need not establish with absolute certainty that a crime has occurred in order to establish reasonable suspicion. *Garcia v. State,* 43 S.W.3d 527, 530 (Tex.Crim.App. 2001). Police officers may justifiably make inferences from visual observations based on their experiences in law enforcement. *Bass v. State,* 64 S.W.3d 646, 650 (Tex.App.--Texarkana 2001, pet. ref'd). Also, facts giving rise to reasonable

5

suspicion may be supplied by information from another person. *Brother v. State*, 166 S.W.3d 255, 257 (Tex.Crim.App. 2005).

The State argues the officers' observations provide specific articulable facts supporting their reasonable suspicion of appellant's involvement in criminal activity. The State points out that, on a U.S. highway on which drug trafficking was common, officers observed (1) appellant's vehicle was clean with no road grime;[3] (2) when appellant passed the troopers, both he and his passenger quickly and simultaneously looked to the right, away from the troopers; (3) appellant and his passenger adjusted their caps and posture when they saw the troopers; (4) appellant almost completely stopped at a blinking caution light when no other vehicles were around; (5) after the troopers turned around to follow him, appellant drove cautiously, keeping his speed under the speed limit and using his brakes often; and (6) appellant and his passenger were "younger individuals" and did not match the "older model" 1999 Chevrolet Lumina. As in *Gonzales-Gilando*, we find that the conduct of appellant and his passenger to which the troopers testified, and reasonable inferences from those facts, did not give rise to a reasonable suspicion that appellant was engaged, had engaged, or was about to engage in criminal conduct. *Gonzales-Gilando,* 2010 Tex.App. LEXIS 949, \*4. Perhaps the circumstances, viewed in their totality and in the light most favorable to the court's ruling, give rise at most to a reasonable suspicion something out of the ordinary was occurring, but we are unable to agree they form the basis for a reasonable

---

[3] One trooper explained that drug traffickers frequently wash their vehicles because they are "so concerned about fingerprints and evidence . . . in every other town or so, they'll stop and wash their vehicle. So that's the reason – that's another indicator we look for clean vehicles."

suspicion criminal activity was afoot. *See Viveros v. State,* 828 S.W.2d 2, 4 (Tex.Crim.App. 1992) (court unwilling to find that driving as defendant did after passing patrol car "well within the speed limit" was suspicious activity creating a reasonable belief that activity is related to crime). *See also Ford,* 158 S.W.3d at 493 (officer's testimony defendant was "following too close" insufficient basis for finding reasonable suspicion); *Loesch v. State,* 979 S.W.2d 47, 52, 53 (Tex.App.–Corpus Christi 1998, no pet.) (vehicle was illegally detained where suspicion derived exclusively from facts concerning defendant's location, that he drove an older vehicle that looked weighed down, and that he did not look at the officers when he drove past them).

The State also contends officers were given a reasonable suspicion appellant was driving an uninsured vehicle by the information relayed through their computers. It is a misdemeanor offense to operate a motor vehicle that is not covered by valid motor vehicle liability insurance or some other means of establishing "financial responsibility." *See* Tex. Transp. Code Ann. § 601.191 (Vernon 1999). If the relayed information gave officers a reasonable suspicion appellant was driving without liability insurance coverage, the deputy's stop of appellant was lawful.

In 2005, the Legislature directed the creation of a program for the verification of vehicle owners' compliance with financial responsibility laws, intended to reduce the number of uninsured motorists in Texas. Tex. Transp. Code Ann. § 601.452 (Vernon Supp. 2009). The legislation required information from insurance companies issuing motor vehicle liability policies in Texas. Tex. Transp. Code Ann. § 601.454 (Vernon Supp. 2009).

7

As the legislation required, the implementing agencies adopted regulations to implement the Financial Responsibility Verification Program. *See* 28 TAC § 5.601-5.611 (Vernon 2006) (regulations of the Texas Department of Insurance). The regulations required insurance companies to submit data on personal auto insurance policies in force in Texas to a database weekly, or to make the data available via an approved web-based system. 28 TAC §§ 5.604, 5.606. The regulations specify requirements for correcting errors and maintaining the accuracy of policy information. 28 TAC § 5.605. The regulations also required that insurers providing information to the database meet and maintain a 95 percent "match rate" beginning January 1, 2008, and a 98 percent rate beginning January 1, 2010.

In *Gonzales-Gilando*, we rejected the State's contention the officers had reasonable suspicion appellant was driving without insurance. We are not persuaded to a different conclusion by the State's further arguments in this case. At oral argument, the State brought *Brown v. State,* 986 S.W.2d 50 (Tex.App.--Dallas 1999, no pet.), to our attention. In *Brown*, Dallas police officers arrested the defendant solely because he was driving a vehicle listed as stolen by the National Crime Information Center (NCIC) computer. *Brown,* 986 S.W.2d at 51. The appellate court found the listing gave officers probable cause for his warrantless arrest for unauthorized use of a motor vehicle. *Id.* at 54. In support of its conclusion, the court cited other instances in which courts had upheld police reliance on NCIC stolen-vehicle information. *Id.* at 52. Concluding its discussion of the reasonableness of the Dallas officers' reliance on the NCIC information, the court found the record before it provided "no reason to question

8

whether stolen vehicle information obtained from the NCIC is *reasonably* trustworthy." (Italics in original). *Id.* at 54.

Two factors distinguish the case at bar from *Brown.* First, in *Brown* the vehicle the defendant was driving was listed as stolen. *Brown,* 986 S.W.2d at 51. Here, it is unclear what information, if any, was conveyed to the officers about appellant's compliance with vehicle insurance requirements. As noted, the officers said the insurance information was "unavailable." Deputy Fowler also once used the word "undocumented" with regard to appellant's insurance. But in this context those terms are not self-explanatory. The record gives us no explanation of their meaning, and we are unwilling to speculate on them. The Department of Insurance regulations for web-based compliance speak of "affirmative" and "negative" responses to inquiries. 29 TAC § 5.608. Even viewed in the light most favorable to the trial court's ruling, the responses the officers described here give no reasonable basis for an inference appellant's car was not insured.

Second, the court in *Brown* was satisfied that the NCIC system had an operating history demonstrating the reasonableness of police reliance on the information it provided. *Brown,* 986 S.W.2d at 54. The record before us contains no such information on the Financial Responsibility Verification Program.[4] The State would have us rely on the agency regulations mandating a certain level of accuracy, but, as we said in *Gonzales-Gilando*, nothing in the record shows those requirements have been met. *Gonzales-Gilando,* 2010 Tex.App. LEXIS 949, *9 n.3.

---

[4] Deputy Fowler estimated the insurance information began appearing on his in-vehicle computer in September or October, before his stop of appellant in November.

The State also has cited *United States v. Cortez-Galaviz,* 495 F.3d 1203 (10th Cir. 2007). There, the court found a Utah state computer system containing vehicle insurance and registration data provided sufficient information to justify a traffic stop. The officer stopped the vehicle when, in response to his computer inquiry about its registration and insurance status, he received a message, highlighted in red, reading "INSURED/Not Found: AS OF /9/30/2005 Recommend request proof of insurance." *Id.* at 1204. Evidence showed the message apparently was one of at least three possible responses to an officer's computer search, the others being messages indicating that the vehicle definitely was or was not insured. *Id.* The court characterized the computer response as telling the officer that "the state database maintained for the purpose of recording vehicle insurance information contained no information suggesting that the owner of the [vehicle] had insured it," and found the information gave the officer reason to stop the vehicle for investigation of a possible insurance violation. *Id.*

Without an understanding of what the terms mean under the nomenclature of our state's insurance verification program, we cannot agree the "unavailable" or "undocumented" responses the officers described here are the equivalent of that in *Cortez-Galaviz.* As the court there noted, the response fairly conveyed a negative implication regarding the defendant's compliance with Utah's requirements. 495 F.3d at 1204. The same is not true here. Deputy Fowler testified that the response he once described as "undocumented" led him to believe the vehicle did not have insurance. Without some foundation for that conclusion, however, we cannot accept it as reasonable. As we noted also in *Gonzales-Gilando,* one of the troopers agreed the response he received indicated, "they could have insurance or they may not have

10

insurance."  While undoubtedly accurate, the statement could be made of any vehicle on the road.

Accepting the officers' testimony in the light most favorable to the trial court's ruling, and deriving from the testimony every reasonable inference, we nonetheless must conclude the officers had no reasonable suspicion appellant was operating a motor vehicle without valid liability insurance, or that criminal activity was otherwise afoot.  The trial court erred by failing to grant appellant's motion to suppress.

Denial of the motion to suppress led to admission of the evidence that officers found drugs in appellant's car.  As in *Gonzales-Gilando*, we find the trial court's erroneous denial of the motion was harmful.  Tex. R. App. P. 44.2.

We sustain appellant's issue, reverse the trial court's judgment and remand the cause to the trial court.

James T. Campbell
Justice

Publish.